**ACME MARBLE & GRANITE COMPANY**

v.

**UNITED STATES.**

**C.D. 4187; Protest 66/77798-17329.**

United States Customs Court,
First Division.

March 18, 1971.

504

Stein & Shostak, Los Angeles, Cal. (Marjorie M. Shostak, Los Angeles, Cal., and Arthur E. Schwimmer, New York City, of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Mollie Strum, New York City, trial attorney), for defendant.

Before WATSON, MALETZ, and RE, Judges.

RE, Judge:

The legal question presented in this case pertains to the proper classification, for customs duty purposes, of a 10 foot high white Carrara marble bas-relief plaque imported from Italy in 1962. The plaque depicts the Resurrection of Christ from the sepulchre with Mary Magdalen at His feet. It was classified by the customs officials under paragraph 232 (d) of the Tariff Act of 1930, as modified, T.D. 54108, as marble wholly or partly manufactured, and assessed with duty at the rate of 21 per centum ad valorem. Plaintiff has protested and claims that the merchandise is properly classifiable under paragraph 1774 of the same act as a shrine or part thereof, and hence admissible duty free.

The pertinent provisions of the Tariff Act of 1930, are as follows:

*Classified under:*
*Paragraph 232(d), as modified by* T.D. 54108

"Marble, breccia, and onyx, wholly or partly manufactured into monuments, benches, vases, and other articles, and articles of which these substances or any of them is the component material of chief value, not specially provided for ..................21% ad val."

*Claimed under:*

*Paragraph 1774, as amended by T.D. 53038 and T.D. 54169*

"Altars, pulpits, communion tables, baptismal fonts, shrines, mosaics, or parts of any of the foregoing, and statuary (except casts of plaster of paris, or of compositions of paper or papier-mache), imported in good faith for the use of, either by order of or for presentation (without charge) to, any corporation or association organized and operated exclusively for religious purposes .....................Free"

The record consists of the testimony of one witness for the plaintiff and four exhibits introduced by the plaintiff. The exhibits are various photographs of the plaque in issue, two of which depict the plaque as installed on the outside front wall of the St. Mary Magdalen Mausoleum in Abbeville, Louisiana. There is also a photograph of the mausoleum (with the plaque installed) taken on the occasion of the formal dedication of the mausoleum.

The witness, Mr. Frank B. Stewart, is president of the plaintiff corporation, a construction firm which imported the plaque. Mr. Stewart is also president of the Lake Lawn Park, Inc., a cemetery development firm. According to the testimony of Mr. Stewart, although the plaintiff corporation and Lake Lawn Park, Inc. are separate and distinct entities, they were almost wholly owned by the Stewart family and it was the practice for Lake Lawn Park, Inc. to be retained "as a developer of a project, and the work, in turn is, done by Acme Marble & Granite Company."

The record establishes that Lake Lawn Park, Inc. was retained to develop a structure in Abbeville for the St. Mary Magdalen Church. It was to be used as a community type mausoleum for its parishioners in the St. Mary Magdalen Cemetery which it owned. The mausoleum was to be similar in design to one developed by Lake Lawn Park, Inc. and constructed by Acme Marble & Granite Company in a community nearby for a private cemetery. Mr. Stewart testified that in the Abbeville project, it was the wish of his late father, then president of the corporations, to donate the plaque in question to further enhance the appearance of the building. Mr. Stewart, who was assistant secretary-treasurer of the corporations at the time the project came into being, stated that Lake Lawn Park, Inc. entered into a contract with St. Mary Magdalen Church under which it assumed "total responsibility of developing and returning to the church the building free of all liens and claims, plus a portion of the proceeds." The contract further called for the mausoleum to be built by Acme Marble & Granite Company, the plaintiff herein, and for Lake Lawn Park, Inc. to serve as exclusive agent in selling the individual crypts to the parishioners of the church.

As for the proceeds of sale, and the financial arrangements among the parties, Mr. Stewart explained:

"The selling price [of the crypts] is a price for the use of it for entombment, or the right of use, and the cost that the individual pays to Lake Lawn, in turn, a portion of this goes to pay for the cost of the building. And on a given formula, a portion of the proceeds of this goes to the church for the remuneration of their land, for perpetual care, and for the income which they would derive from a project such as this."

Pursuant to contract, Lake Lawn Park, Inc. handled all business transactions, including the advertising of the crypts for sale. From "the individual selling price of the crypts" it received payment for these services as did the plaintiff for the construction of the mausoleum. On cross-examination Mr. Stewart emphasized that the church received a portion of the sales price not only "for the use of the land, for perpetual care" but also as "their income as a normal procedure in this type of project."

Mr. Stewart testified further that "the cost or the selling price to the public [was] the controlling factor in what the proceeds, or the general return, or the general income, gross income, of the mausoleum will yield." He stressed that the price, for the construction of the St. Mary Magdalen Mausoleum, did not include the cost or installation of the plaque since it was presented, without charge, to the St. Mary Magdalen Church in Abbeville. Mr. Stewart was present on the occasion of the dedication of the mausoleum and had seen the plaque several times since its installation. On those occasions, funeral or memorial services were held in front of the plaque since "there is no altar or other shrine or area within the 20 acre cemetery."

At the trial, plaintiff's counsel read the following definitions of "shrine" as a foundation for eliciting Mr. Stewart's opinion as to whether the plaque in issue constituted a shrine:

"a small chapel or temple, or other sacred object or place peculiarly consecrated to and supposed to be hallowed by the presence of some deity, saint, mythological hero, or other personality reputed sacred." Century Dictionary and Cyclopedia.

"a place or object hallowed from its history or association." Webster's New International Dictionary.

"a receptacle containing an object of religious veneration—a niche for sacred things. A place where worship is offered or devotions are paid to a saint or deity." Murray's New English Dictionary.

Mr. Stewart agreed with the definitions, and stated that he regarded the plaque on the St. Mary Magdalen Mausoleum to be a shrine. He added that "it [was] the only and the single focal point within hundreds of feet in any direction * * * [i]n fact, within the whole confines of the cemetery, and it is thought of by more than myself because we personally handle the sale of the individual crypt space for the church, as an agent of the church, to the in-

dividual families, and the individual families, some 200 of which, regarded this as a shrine."

Mr. Stewart also provided the only testimony designed to meet an additional requirement for free duty under paragraph 1774 by stating that the St. Mary Magdalen Church was "organized and operated exclusively for religious purposes."

The question presented for determination is whether the bas-relief plaque, as installed on the St. Mary Magdalen Mausoleum in St. Mary Magdalen Cemetery, owned by the St. Mary Magdalen Church in Abbeville, Louisiana is a shrine within the purview of paragraph 1774 of the Tariff Act of 1930. If it is a shrine, within the purview of that paragraph, it is entitled to entry duty free.

It should be noted at the outset that it is not claimed that the St. Mary Magdalen Mausoleum is a shrine and that the plaque that has been installed is therefore a part of a shrine. Nor is it claimed that the presence and use of the plaque have made the mausoleum a shrine. Rather, plaintiff claims that *the plaque*, as and where installed, is a shrine, and having been donated to the St. Mary Magdalen Church, an institution organized and operated exclusively for religious purposes, is exempt from *duty*.

The record reveals that, uninstalled or apart from its particular setting, the plaque would have no more significance for Mr. Stewart or the members of the St. Mary Magdalen parish, than any other object depicting a religious scene. As the patroness saint both of the church and the cemetery, however, the portrayal of Mary Magdalen at the sepulchre is of special significance for the parishioners of the church whose loved ones have been or will be buried in the mausoleum which bears her name. This fact alone, however, does not compel an application of paragraph 1774 to the importation at bar if it does not otherwise qualify, in all respects, as a shrine within the intendment of Congress. The question before the court, therefore, is

not what constitutes a shrine from an ecclesiastical point of view, or from the personal point of view of one or more laymen, but rather whether the bas-relief plaque is a shrine within the meaning of the tariff laws.

The court has examined all of the cases cited in the briefs of both parties, and has concluded that the importation at bar is not a shrine within the purview of paragraph 1774 of the Tariff Act of 1930.

An early case which dealt with shrines interpreted the Congressional intent applicable to paragraph 1674 of the Tariff Act of 1922, the predecessor provision to paragraph 1774, pertinent in the case at bar. In that case, Daprato Statuary Co. v. United States, 16 Ct.Cust.Appls. 233, 235 T.D. 42840 (1928), the Court of Customs Appeals stated that "the terms 'alter' and 'shrine' were used by Congress in a restricted and strictly religious sense." The appellate court therefore affirmed a holding of this court that a marble, mosaic floor of a church, upon which rested an altar and two shrines, was not part of an altar or shrine. The court also observed that "[a]ltars and shrines * * * have an individuality of their own * * *." It defined the term "shrine" as signifying "either a chapel dedicated to some holy personage or a thing, receptacle, case, tomb, or altar made venerable by some historic event or sacred association." *Id.* at 235.

It is true, however, that subsequent cases have enlarged the concept of the term "shrine" for tariff purposes. Thus, in C. Wildermann Co. v. United States, 56 Treas.Dec. 572. T.D. 43713 (1929) religious statuary in the form of the Stations of the Cross was held to be shrines under paragraph 1674 of the Tariff Act of 1922, although the stations were outdoors and not physically present inside a religious edifice. Since the Treasury Department had interpreted paragraph 1774 to relate only to merchandise suitable for use inside a religious edifice, the statuary had been classified under paragraph 211 of that

act as decorated articles of terra cotta. The court said:

"Congress in providing *eo nomine* for shrines in paragraph 1674, *supra,* did not provide either expressly or by implication where such articles should be used, and under the rules of construction in cases of this kind all forms of the article mentioned in the paragraph of the law are included therein, providing they are imported in good faith for presentation (without charge) to, and for the use of, any corporation or association organized and operated exclusively for religious purposes, irrespective of whether they are intended for use out of doors or indoors." *Id.* at 575.

As to whether the Stations of the Cross constituted shrines for tariff purposes, the court observed that "although a shrine was originally a tomb containing the bones of saints or other sacred person, the meaning of the word has, through the ages, been recognized by the lexicographers to have enlarged in scope so as to embrace a receptacle containing an object of religious veneration, such as a niche for sacred images. It is clear, therefore, that pieces of statuary, having carved therein scenes representing Christ on the way to the Cross, and having as their purpose the creation of religious veneration in man, are shrines." *Id.* at 574.

The case of Patrick J. Temple v. United States, 65 Treas.Dec. 1249, Abs. 26784 (1934) was decided under paragraph 1774 of the Tariff Act of 1930, the pertinent paragraph of the case at bar. Except for the addition of the parenthetical phrase dealing with statuary of plaster of paris, paper or papier mache, paragraph 1774 of the Tariff Act of 1930 is identical to paragraph 1674 of the Tariff Act of 1922. In the Patrick J. Temple case the court held that plaster of paris images of several saints, and a statute of the "Pieta", placed in the basement of a Catholic mission were shrines, since they inspired veneration and before which "special devotional

services" were held frequently, and sometimes daily.

On the other hand, in Columbo Co. v. United States, 71 Treas.Dec. 186, T.D. 48794 (1937), a mosaic of colored glass, depicting a scene of "Christ Among the Children" and imbedded in the baptistry walls of a church, was held not to be a shrine. The court found "no evidence in the record * * * to show that the mosaic in question incites veneration and devotion upon the part of the worshippers or that it accomplishes any other purpose than that of a decoration for the baptistry." Id. at 188. The court consequently held that the mosaic was properly classified as an article of colored glass under paragraph 218(f) of the Tariff Act of 1930.

In the case of The Gasparri Studios v. United States, 33 Cust.Ct. 470, Abs. 58614 (1954) the merchandise consisted of a marble frame or mounting and a bronze grill which were imported to surround a painting of the Madonna and Child above and behind the main altar of a church. It was classified by the customs officials as an entirety, as an article, not specially provided for, the component material of chief value of which is marble, under paragraph 232 (d) of the Tariff Act of 1930. The court found that it had been designed and intended as an integral unit and that special devotions were conducted before it. Hence, it held the marble and bronze grill to be parts of a shrine under paragraph 1774 of the Tariff Act of 1930.

On the authority of Daprato Statuary Co. v. United States, 16 Ct.Cust.Appls. 233, T.D. 42840 (1928), this court has also held that 12 majolica tiles depicting an abstract presentation of "The Last Supper" and set in a wall behind the altar of a church were not parts of a shrine. Lea's v. United States, 41 Cust. Ct. 4, C.D. 2012 (1958).

In the case of United States v. Rambush Decorating Co., et al., 48 CCPA 123, C.A.D. 776 (1961), although the merchandise was not a shrine, and the question presented was whether a reredos was part of an altar under paragraph

1774, the court's opinion is relevant here since it referred to congressional intent which is also applicable to the case at bar. Referring to paragraph 1774, the court noted:

" * * * it should be remembered that Congress exempted only certain items of church furniture from import duty, and it is incumbent upon us in endeavoring to carry out the will of Congress not to expand the exempted list beyond the clear intent of Congress. * * *

"Although it has been urged that when ecclesiastical words are involved, canonical law should be controlling, nothing has been brought to our attention which convinces us that we should ascertain the congressional meaning of such words differently than when confronted with purely secular words." 48 CCPA at 125.

In another case involving construction of paragraph 1774, where the question pertained to the meaning of the term "pulpit", our appellate court has observed:

"We are aware of the expressions on the part of the Supreme Court and other courts that provisions relating to articles imported solely for religious purposes 'should be liberally construed in favor of the importer, and if there were any fair doubt as to the true construction of the provision in question the courts should resolve the doubts in his favor.' [Benziger v. United States, 192 U.S. 38, 24 S.Ct. 189, [48 L.Ed. 331] (1904.)] In this case we do not have such doubt. The intent of Congress in enumerating five [a sixth, mosaics, was added by P.L. 1001 in 1956] specific pieces of ecclesiastical furniture or architecture, and no more, and in failing to include any general phrase such as 'and similar articles' was certainly not to invite a strained construction in order to allow free entry for all kinds of church furniture." United States v. St. Joseph's Church, 48 CCPA 42, 45, C.A.D. 761 (1960).

These principles were reaffirmed by our appellate court in United States v. Greek Orthodox Church of Evangelismos, 49 CCPA 35, C.A.D. 792 (1962). There the question presented pertained to the classification of an iconostasis which was a screen or partition erected in the sanctuary of a Greek Orthodox church upon the same platform which holds the altar table. The importation had been classified under paragraph 412 of the Tariff Act of 1930 as a manufacture of wood, not specially provided for. Plaintiff claimed the iconostasis was a shrine, or part of a shrine, under paragraph 1774. Although the court's opinion referred, at length, to the liturgy of the Greek Orthodox church, it did so "merely for the purpose of showing the function (not the nature) of the iconostasis as installed in the church." Having found that the iconostasis contained several panels on which icons (holy pictures), representing the persons of Jesus, the Virgin Mary and various saints, were regarded as sacred, the court concluded that each icon, with its immediate setting, was a shrine within the meaning of the Tariff Act of 1930. Consequently, the court concluded that the iconostasis, which held these sacred pictures, should not be excluded "from the meaning of the word 'shrine' (or part of a shrine) merely because it houses eight shrines instead of one."

In reaching its decision in the *Greek Orthodox Church of Evangelismos* case, the court cited the *C. Wildermann Co.* case and observed that the word "shrine" had acquired a wide range of meanings and that it is commonly applied to a variety of objects, structures and places. It also noted that dictionary definitions of the term were not "of very much help" and that "[w]hen lexicons have proved to be inconclusive, the courts have looked to testimony in the record * * * and to legislative history. Atlantic Aluminum & Metal Distributors, Inc. v. United States, 47 CCPA 88, 90, C.A.D. 735 [1960]."

In Westfeldt Brothers v. United States, 48 Cust.Ct. 125, 127, C.D. 2323 (1962), this court held that stained glass windows, representative of the baptism of Christ and several saints installed in different parts of a church, were not shrines under paragraph 1774. After noting that "[t]he provision for shrines and parts thereof has been the subject of much tariff litigation", Chief Judge Oliver, writing for the court, observed that "in all of the cited cases, the court, sustaining the claimed classification for shrines or parts of shrines, found the merchandise to consist of a religious article or a religious unit, particularly located in a church, for worshipers to pay special reverence, or to incite devotion upon the part of the worshipers, through special services that were conducted before the shrine." The court, in overruling the protest, stated:

> "The stained glass windows involved herein do not meet such standards. While they are not, as the record discloses, the windows of the building, which is protected from the elements of the weather by plate glass windows, these stained glass windows are the windows of the church, and, as such, they are, by design and construction, conducive toward promoting a spirit of prayer and meditation for parishioners of worshipers." 48 Cust.Ct. at 129.

Although the record in the *Westfeldt Brothers* case disclosed that the stained glass windows were "specifically selected for their devotional and inspirational influence over parishioners," the court, quoting the testimony of the pastor of the church, said " 'actually, in the building of a church everything is supposed to inspire devotion,' but 'not every place or every object intended to inspire devotion is a shrine.' "

The more recent case of John Horvath Company v. United States, 59 Cust.Ct. 397, C.D. 3174 (1967), which dealt with 15 marble plaques depicting the Mysteries of the Rosary, was also the occasion for an examination by this court of the cases which have dealt with altars and shrines. In holding that the plaques, which had been attached to a column on

each side of the altar and on the triangle above the baldachino, were not shrines, the court again applied the test as to whether they were special objects of veneration and before which special services were conducted. The court noted that "[t]heir specific location militates against this" and found that their purpose "was evidently to incite veneration and devotion during services conducted before the main altar and not separately, as in the case of the Stations of the Cross or other shrines." [Emphasis added.]

What was said of the Mysteries of the Rosary, in the *Horvath Company* case, can be said of the marble plaque in the case presently before the court. The record is clear that, apart from any funeral or commitment service held at the mausoleum in St. Mary Magdalen Cemetery, the plaque was neither the scene nor the object of any religious ceremony. At no other time were special devotions conducted before it. Nor was the plaque in itself the object of special veneration. In fact, whatever homage was paid to the plaque was the consequence of and as an adjunct of the services conducted at the mausoleum for the deceased.

It would seem clear that the only function of the plaque was to promote, or inspire, on the part of mourners during services for their loved ones, "a spirit of prayer and meditation", like the stained glass windows in the *Westfeldt Brothers* case. Rather than the object of devotion for its own sake or "separately", as stated in the *Horvath Company* case, the plaque was merely an aid in the solemnity or veneration inspired by the funeral or memorial mass. Thus, the veneration displayed on those limited occasions resulted from the services that were being performed there, and not because of the presence or existence of the plaque. Like the mosaic in the baptistry wall in the *Columbo Co.* case, the majolica wall tiles behind the altar in the *Lea's* case, and the stained glass windows in the *Westfeldt Brothers* case, the plaque in the instant case served as a decorative feature of the mausoleum walls and an appropriate setting for memorial services. In the words of the *Deprato Statuary Co.* case, it had no "individuality" of its own, the quality required for shrines and altars. 16 Ct.Cust.Appls. at 235.

In the case at bar, the conclusion that the plaque is not a shrine finds additional support in Mr. Stewart's testimony that established that it was donated not to inspire but to "further enhance" the appearance of the building. It is also noteworthy that there is nothing in the letters of donation and acceptance which refers to the plaque as a shrine or as having any religious significance. Finally, one of plaintiff's exhibits shows two signs located at the front of the mausoleum that state: "Another work of art on show by Acme Marble & Granite." Whether the reference is to the building, of which the plaque on the wall is an integral part, or to the plaque alone, "works of art", as stated by this court, are not, as such, "to be dignified as shrines, within the judicial interpretation of the term 'shrine.'" Westfeldt Brothers v. United States, 48 Cust.Ct. 125, 130, C.D. 2323 (1962).

Thus, notwithstanding the fact that the courts have enlarged the concept of the term "shrine" since the decision in the *Deprato Statuary Co.* case, it is still essential that for merchandise to be a shrine in the tariff sense, it must be the *reason* or *cause* for the veneration and not merely the *scene* or *place* of veneration. Although the mausoleum was a holy place on those occasions when the mass, the highest form of worship in the Catholic liturgy, was celebrated, it did not thereby become a shrine but retained its character as a mausoleum. It was only the fact that it was a mausoleum that brought the parishioners of St. Mary Magdalen Church to its steps, and to pay homage, before the plaque of St. Mary Magdalen and Christ at the Sepulchre, in remembrance of their deceased friends and relatives. Notwithstanding some of the testimony of rec-

ord, the St. Mary Magdalen Mausoleum was a place of burial and not one of worship.

■ Nor can it be said that the blessing or dedication of the mausoleum made it or the plaque a shrine. Just as the religious services conducted at the mausoleum were performed on the occasion of and in aid of the burial services, the dedication ceremony likewise blessed the place of interment as well as those who already were buried there.

In all of the cases where the claimed classification of importations as shrines was sustained under paragraph 1674 of the Tariff Act of 1922 or paragraph 1774 of the Tariff Act of 1930, the further requirements were satisfied pertaining to their "presentation (without charge) to, any corporation or association organized and operated exclusively for religious purposes." Although there is some question as to whether the plaintiff or Lake Lawn Park, Inc. was, in fact, the donor of the plaque, there is uncontradicted evidence in the record before the court of its donation to St. Mary Magdalen Church. Defendant, however, has raised the issue as to whether St. Mary Magdalen Church was, in this instance, an association "organized and operated exclusively for religious purposes."

Although there is no doubt that the St. Mary Magdalen Church is a religious institution, it must nevertheless qualify as "a corporation or association organized and operated *exclusively for religious purposes*." [Emphasis added.] The issue arises because the plaque was used by St. Mary Magdalen Church not as a religious institution but in its capacity as the proprietor of a mausoleum. Plaintiff has responded by citing the case of Deprato Statuary Co. v. United States, 58 Treas.Dec. 127, T.D. 44190 (1930) for the proposition that "the 'exclusively religious' requirement of Par. 1774 (and its predecessor, Par. 1674 of the Tariff Act of 1922) is satisfied if the imported article is installed in a cemetery owned by a religious society." (Plaintiff's brief, p. 11.) It may be not-

ed that although the *Daprato Statuary Co.* case pertained to paragraph 1674 of the Tariff Act of 1922, the provision pertaining to shrines was not changed in the Tariff Act of 1930.

The merchandise in the *Daprato Statuary Co.* case consisted of "works of art" stipulated by the parties to have been "set up as a statue on a plot of ground in a cemetery" owned by the Chapel of the Immaculate Heart, an incorporated religious society. The statute with pedestal had been classified under paragraph 1449 of the Tariff Act of 1922 which provided for statuary. The plaintiff claimed that "this statue is free of duty under paragraph 1674 of the same law as an entirety, being *statuary* imported for the use of a chapel." [Emphasis added.] The court said:

"It appears from the record that the reason for the assessment in this case was that the Treasury Department had issued instruction to collectors (T.D. 42298) that paragraph 1674 covered only such articles as were commonly used on the inside of a church. This interpretation of the statute was disapproved by this court in Wildermann v. United States, T.D. 43713, which involved certain church statuary imported for presentation to and for the use of a religious institution. The court held that although these statues, which were in the nature of shrines, were for use outside the church edifice, they were nevertheless within the purview of the paragraph." *Id.* at 128.

The court added:

"In view of this decision and bearing in mind that the cemetery in which this statue is to be used is the property of the religious corporation to which the statue was presented we hold that all the requirements of the statute have been met and that the importation is free of duty under paragraph 1674 * * *." *Ibid.*

It is clear that the thrust of the opinion in the *Daprato Statuary Co.* case dealt with the placing of statuary outdoors as well as indoors. Hence, on the

authority of the *C. Wildermann* case, the court decided in favor of the plaintiff. There was no doubt in the *Daprato Statuary Co.* case that the importation was, in fact, statuary.

It is true that the requirement of *exclusive religious purposes* applies to statuary as well as to shrines. The *Daprato Statuary Co.* case, however, is not determinative of the issue raised by the defendant in the case at bar because it does not appear to have been raised or considered by the court in that case. The opinion of the court in the *Daprato Statuary Co.* case was predicated on the finding that the cemetery was church property.

The court is of the opinion that for the applicability of paragraph 1774 of the Tariff Act of 1930 more is required than the use of the importation on property owned by the religious institution. As far back as 1933 this court decided that statues of religious figures presented to a protectory for boys under the care of the Franciscan Brothers, admittedly a religious association, were not exempt from duty under paragraph 1774 of the Tariff Act inasmuch as the protectory was organized and operated for educational purposes as well. F. Pustet Co., Inc. v. United States, 64 Treas.Dec. 352, T.D. 46667 (1933). Similarly, in the case of J. M. Altieri v. United States, 48 Cust. Ct. 196, C.D. 2334 (1962), a plaque of St. Joseph, installed in a wall above an entrance to the Colegio San Jose, Puerto Rico, was held not entitled to free duty since the Colegio San Jose was "not exclusively a religious corporation."

Of particular importance is the case of Gerstner & Statt v. United States, 52 Cust.Ct. 266, Abs. 68308 (1964) where a religious statue was presented, without charge, to the Diocese of Rochester. It was accepted by the Bishop and erected "as part of a shrine on the grounds of St. Mary's Hospital in Rochester." The court there stated:

"For plaintiff to sustain its claim under amended paragraph 1774 * *, it was necessary to establish that the corporation or association, i. e., St. Mary's Hospital of Rochester, that received the statue in question is 'organized and operated *exclusively* for religious purposes.' [Italics supplied.] F. Pustet Co., Inc. v. United States, 64 Treas.Dec. 352, T.D. 46667; Benziger Brothers v. United States, 7 Treas. Dec. 908, T.D. 25357; Massachusetts General Hospital v. United States (112 Fed. 670) [1st Cir. 1901]." 52 Cust. Ct. at 266–267.

After finding that the record did not support plaintiff's claim, in that "the hospital is mainly or principally an educational and medical institution and is not within the class or kind of organizations or associations contemplated by amended paragraph 1774," the court overruled the protest.

The *Pustet Co., Inc., Altieri* and *Gerstner & Statt* cases demonstrate that the requirements of paragraph 1774 were not met even though the statues in those cases were used on the property of religious institutions. Neither was it sufficient that the importation was used in a religious way by a religious institution. The court in those cases looked not to where the statue was used but to the institution making use of it. Since it found, in each case, that the institution making use of the statue was not "organized and operated exclusively for religious purposes", free entry was denied.

The question for determination, in the case at bar, has nothing to do, therefore, with the location of the plaque, whether on college grounds, hospital grounds or cemetery grounds. It pertains to the qualification of St. Mary Magdalen Church as an association entitled to free entry under paragraph 1774. If it is an association exclusively religious in purpose, as was the Chapel of the Immaculate Heart, in the *Daprato Statuary Co.* case [58 Treas.Dec. 127, T. D. 44190 (1930)], then the requirement of paragraph 1774 will have been met. If it is not, as in the *Pustet, Altieri* and *Gerstner & Statt* cases, the requirements of paragraph 1774 have not been met. It seems clear that the requirements are not met by a donation, in the first in-

stance, to a parent organization exclusively religious such as the Diocese of Rochester in the *Gerstner & Statt* case. The test, as stated and applied in that case is whether the institution that makes *ultimate* use of the donated article is one that is "organized and operated exclusively for religious purposes." To hold otherwise would violate the spirit and purpose of paragraph 1774.

In the case at bar, the bas-relief plaque was donated to the St. Mary Magdalen Church. It was not used by St. Mary Magdalen Church as such but by the St. Mary Magdalen Cemetery. As stated previously, the fact that the cemetery was owned by the church is not determinative of the question whether the requirements of paragraph 1774 were met. It may be added that, in the absence of the contract governing the relationships among the church, the plaintiff and Lake Lawn Park, Inc., no finding can be made that the mausoleum was the exclusive property of the church. Indeed, in view of Mr. Stewart's testimony that all the crypts had not been sold, even as late as the date of trial, it is doubtful that the plaintiff and Lake Lawn Park, Inc. had relinquished all claims to the mausoleum on the date of importation.

■■ What is determinative of the legal question in this case is whether the institution making use of the plaque is "organized and operated exclusively for religious purposes." Even assuming that the cemetery, the institution which made *ultimate* use of the plaque, and the St. Mary Magdalen Church, are one, still it can not be said that the plaque was imported "for the use of * * * [a] corporation or association organized and operated exclusively for religious purposes."

It is to be noted that no articles of incorporation were produced at the trial to establish that the St. Mary Magdalen Church was an organization exclusively religious in purpose. The evidence is to the contrary, inasmuch as it establishes that the church owned and operated a cemetery for public use, and for profit. Such an activity does not come within the essential and commonly understood purposes of a religious institution. Whether St. Mary Magdalen Church may, in fact, have been organized for strictly religious purposes, the fact remains that, in this instance, it was not an organization operating exclusively for religious purposes.

Only recently, this court had occasion to examine numerous cases to determine whether certain organizations qualified for free entry of various items under statutory provisions which required that they be incorporated *solely* for a stated purpose. Moral Re-Armament, Inc. v. United States, 65 Cust.Ct., C.D. 4056, 317 F.Supp. 261 (1970). In that case, Judge Maletz, writing for the court, noted the specificity and the strictness of construction applied to the term "solely" in paragraph 1631 of the Tariff Act of 1930 with respect to the importation of photographic film. The strictness of construction is no less applicable here with respect to the term "exclusive".

Moreover, the evidence in the case at bar establishes that the plaque was not used by the church or cemetery, but rather in a joint venture in which St. Mary Magdalen Church was only a part. In the words of the defendant, in its brief, the plaque was "a part of a mausoleum which was operated by a commercial firm for profit, Lake Lawn Park, Inc. * * * " and the evidence supports defendant's statement. Not only was Lake Lawn Park, Inc. the exclusive agent for sale of the crypts, but it was also the sole entity responsible for the mausoleum's management. It was not only an agent of the church but also had a financial interest in that venture as did the plaintiff, and the church. Unlike the *Daprato Statuary Co.* case, [58 Treas. Dec. 127, T.D. 44190 (1930)], use of the plaque in the case at bar involved a commercial enterprise not within the contemplation of Congress when it accorded free entry to certain religious items un-

**514**

der paragraph 1774 of the Tariff Act of 1930.

It is interesting to note that, subsequent to the importation herein, paragraph 1774 was amended to extend the free entry privilege to "cemeteries, schools, hospitals orphanages, and *similar nonprofit activities* staffed and controlled by corporations or associations organized and operated for religious purposes." [Emphasis added.] 97 Treas. Dec. 661, T.D. 55750. Although Congress has since recognized that cemeteries, schools, hospitals and orphanages are often owned and operated by religious institutions, it still required that they be nonprofit activities. By adding the phrase that such activities be staffed and controlled by the religious institution, it also retained the requirement that use of the importation be made exclusively by the religious institution, although it could now do so in any of its expanded roles. This amendment, though subsequent to the importation of the plaque at bar, tends to confirm the previously expressed congressional intent pertaining to the organizations and activities specified in paragraph 1774 of the Tariff Act of 1930. See Jacques Isler Corp. v. United States, 63 Cust.Ct. 283, C.D. 3909 (1969), affirmed, 58 CCPA, C.A.D. 999 (1970). As stated in United States v. Dr. Oidtmann Studios, Inc. (Geo. Wm. Rueff, Inc.), 31 CCPA 116, 122, C.A.D. 260 (1943), the courts are "not at liberty to enlarge by construction the plain and unambiguous provisions of the statute [1774]."

From the foregoing, the court finds that the plaintiff has not borne its dual burden of proof and has failed to overcome the presumption of correctness that attaches to the classification of the plaque herein, as an article of marble wholly or partly manufactured, and dutiable under paragraph 232(d) of the Tariff Act of 1930, as modified. The classification is consequently sustained and the protest is overruled. Judgment will issue accordingly.